19

↳b FILED

DEC 0 4 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                    )        Case No. 12-19125-B-7
                                         )
John Owens,                              )
Brenda Diane Owens,                      )
                                         )
        Debtors.                         )
_____)
                                         )
                                         )
American Express Centurion               )        Adv. No. 13-1018
Bank,                                    )
                                         )
        Plaintiff,                       )
                                         )
    v.                                   )
                                         )
John Owens and                           )
Brenda Diane Owens aka                   )
Brenda D. Owens,                         )
                                         )
        Defendants.                      )
_____)

**MEMORANDUM DECISION REGARDING
NONDISCHARGEABILITY OF CREDIT CARD DEBT**

John M. O'Donnell, Esq., of the Law Offices of John M. O'Donnell, appeared on
behalf of the plaintiff, American Express Centurion Bank.

Frank P. Samples, Esq., appeared on behalf of the defendants, John and Brenda
Owens.

        The plaintiff in this adversary proceeding, American Express Centurion

Bank (the "Bank"), seeks a judgment for the unpaid balance on a credit card

account (the "Account") owed by the debtor-defendants John and Brenda Owens

1    (the "Debtors").  The Bank also seeks a determination that the judgment is not

2    dischargeable under 11 U.S.C. § 523(a)(2)(A).[1]  Specifically, the Bank

3    challenges 69 transactions involving two credit cards issued to the Debtors (the

4    "Credit Cards") which it contends were used with fraudulent intent.  The Debtors

5    do not dispute the charges and accept responsibility for the debt, but contend

6    (through discovery responses) that the Credit Cards were used without their

7    knowledge by family and friends who knew that the Debtors were preparing to

8    file a bankruptcy petition.[2]  For the reasons set forth below, a nondischargeable

9    judgment will be entered in favor of the Bank.

10        This memorandum decision contains the court's findings of fact and

11   conclusions of law required by Federal Rule of Civil Procedure 52(a), made

12   applicable to this adversary proceeding by Federal Rule of Bankruptcy

13   Procedure 7052.  The court has jurisdiction over this matter pursuant to 28

14   U.S.C. § 1334, 11 U.S.C. § 523, and General Order Nos. 182 and 330 of the U.S.

15   District Court for the Eastern District of California.  This is a core proceeding as

16   defined in 28 U.S.C. § 157(b)(2)(I).  All parties have consented, in their final

17   pre-trial statements, to the entry of a final judgment by the bankruptcy court.

18   **BACKGROUND AND FINDINGS OF FACT.**

19        **Case Overview.**  The Debtors first met with their bankruptcy attorney in

20   late September 2012 and paid him a retainer to represent them in this bankruptcy

21   on October 12, 2012.[3]  They signed a voluntary petition for relief under chapter 7

22

23

24        [1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, as enacted and promulgated *after* October 17, 2005, the

25   effective date of the Bankruptcy Abuse Prevention & Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

26

27        [2] The defendants John and Brenda Owens did not attend the trial or offer any defense to the Bank's case.

28        [3] Debtors' discovery responses, Interrogatories numbers 5 and 6.

on October 25, 2012 and it was filed on October 30, 2012. The chapter 7 trustee
filed a report of no assets on December 17, 2012, and the Debtors received a
general discharge on February 19, 2013. This adversary proceeding to determine
the dischargeability of the Bank's claim was timely filed on February 11, 2013.
On July 2, 2013, after commencement of this adversary proceeding, the court
granted the Debtors' request to convert this case to one under chapter 13.
However, they did not file a chapter 13 plan or attend the chapter 13 meeting of
creditors. On September 25, 2013, they reconverted the case back to chapter 7.

**Background of the Debtors.** Based on the schedules and other
documents filed in this bankruptcy case, it appears that the Debtor is retired and
receiving social security benefits. The co-debtor is a correctional officer with the
California State prison system. At the time the petition was filed the Debtors had
three dependents, ages 19, 20 and 33. According to Schedule I, the household's
average monthly income in the amount of $7,776.05 is comprised solely of the
Debtor's social security and pension benefits, and the co-debtor's wages.
Monthly expenses are reported on Schedule J in an equal amount leaving a
monthly net income of $0. The Debtors listed household goods, furniture, etc.,
with an aggregate value of $4,000, clothing valued at $300, checking and savings
accounts that total approximately $5,000 and a retirement plan valued at $35,000.
They listed two automobiles, a 1999 Ford pickup with a value of $2,000 and a
2007 Camry worth $4,775. All of the property listed on Schedule B was claimed
as exempt. On Schedule F, the Debtors listed unsecured non-priority debts
totaling $142,914, much of which appears to relate to credit cards and revolving
charge accounts.

**The Credit Cards - Prepetition Account Activity.** The Debtors'
relationship with the Bank began in 1999, when the Bank opened the Account in
the name of John Owens. It appears that Brenda Owens was an additional card
holder and the Bank issued the Credit Cards to both of the Debtors. The Bank's

3

witness testified that the Debtors used the Credit Cards responsibly prior to October 2012 and paid the Account balance every month for more than twelve years.[4]  This testimony is corroborated by the monthly statements for the Account which were admitted into evidence.

The Bank offered into evidence copies of the Account's billing statements for the year prior to the charges at issue in this adversary proceeding (the "Disputed Charges").  Those statements show a fairly consistent pattern of Credit Card usage.  In general, charges to the Account ranged between $1,000 and $2,000 a month.[5]  These charges appear to have been for ordinary expenses such as gasoline, cell phone bills, fabric and crafts, fast food, groceries, household expenses, and a reoccurring charge for credit monitoring.  The month of July 2012 was an anomoly.  The charges that month increased to more than $7,000.  A review of the August 2012 billing statement, however, shows that the sudden increase was attributable to unusual auto repairs and travel expenses.  Until October 2012, the Debtors kept their Account current and paid the outstanding balances as they came due.

**Disputed Credit Card Activity.**  The Disputed Charges were all incurred after the Debtors first consulted with their bankruptcy attorney.  Indeed,

---

[4]The only witness at trial was Walter E. Gibbs, the Bank's custodian of the records for the Debtors' Account.

[5]During the year prior to the filing of the petition, the Debtors made new charges to the Account in the following amounts as reflected in the monthly statements:

| | |
|---|---|
| December  2011 | $2028 |
| January 2012 | 1197 |
| February | 2150 |
| March | 1306 |
| April | 1818 |
| May | 1340 |
| June | 2507 |
| July | 7223 |
| August | 2511 |
| September | 1146 |
| October | 9889 |

4

the most extraordinary transactions occurred after the Debtors signed their petition and schedules.  While the November 2012 billing statement (for charges made in October 2012) includes transactions that appear consistent with the Debtors' prior use of the Credit Cards, such as payments for prescriptions, gasoline, and fast food, it also discloses numerous charges for purchases that do not conform to the Debtors' typical pattern of use.  In addition, the Credit Cards were used for the  purchase of many items that appear to be luxury goods.

On October 28, three days after the petition was signed, the following purchases were charged to John Owens' Credit Card: Canon USA Direct, Electronics, $943.77 (during the prior year neither Debtor had used the Credit Card with this vendor); and Overstock.com, $1,748.83 (neither Debtor had used the Credit Card for this vendor during the prior year).  On October 29, one day before the bankruptcy petition was filed, John's Credit Card was used for a $2,489.03 purchase at The Home Depot.

Charges made to Brenda Owens' Credit Card included a first-time charge of $196.58 at Babies R Us and two first-time charges totaling $124.29 made on the same day at Party City.  On October 23, Brenda's Credit Card was used for the first time at the restaurant, THJ, for a charge of $126.23.  The day after the petition was signed, on October 26, a $400 Coach purse was purchased with Brenda's Credit Card at Macy's, a vendor Brenda Owens had previously visited, but from whom her prior purchases had been modest.  On the same day her Credit Card was used for three additional transactions at Macy's: $220.81 for clothing; $149.06 for shoes; and $49.34 for jewelry.  Also on the 26th, Brenda's Credit Card was used for two separate purchases at Best Buy which totaled approximately $1,560.

5

1   **Issues Presented.** This proceeding arises from an unpaid debt owed to

2   the Bank in the amount of $8,785.19.[6]  Specifically, it appears that charges

3   totaling approximately $9,889 were made to the Debtors' Account in the month

4   of October 2012, after the Debtors first met with their bankruptcy attorney.[7]  The

5   Bank contends that the Debtors knew they were preparing to file a bankruptcy

6   petition and made these charges to their Account with (1) knowledge they

7   couldn't repay the debt and (2) an intent to discharge the debt in this chapter 7

8   case.  The parties stipulated that the monthly statements for the Account were

9   accurate and admissible.

10  **DISCUSSION AND CONCLUSIONS OF LAW.**

11      **The "Fraud" Exception to Discharge Under § 523(a)(2)(A).**  To

12  balance the fresh start afforded to "honest but unfortunate" debtors through a

13  discharge of debts, the Bankruptcy Code excepts from discharge any debt "for

14  money, property, services, or an extension, renewal, or refinancing of credit, to

15  the extent obtained by . . . false pretenses, a false representation, or *actual fraud.*"

16  § 523(a)(2)(A) (emphasis added).  To prove actual fraud, a creditor must

17  establish each of the following five elements: (1) that the debtor made false

18  representations; (2) that at the time he knew they were false; (3) that he made

19  them with the intention and purpose of deceiving the creditor; (4) that the

20  creditor relied on such representations; and (5) that the creditor sustained the

21  alleged loss and damage as the proximate result of the representations having

22  been made. *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086

23

24      [6]The charges incurred after the Petition was filed are not at issue in this case.

25      [7]The central exhibit in this case is the November 2012 monthly billing statement
    for the period between October 2, 2012 and November 2, 2012.  (Plaintiff's exhibit 2,
26  pages 110-116)  The Account began the period with an unpaid balance of $122.54.  The
    total charged to the Account during the time at issue was $9,574.10.  The Account was
27  credited $41.49 for items returned during that period, and an additional $169.96 for
    items returned post-petition.  Two payments totaling $700 were posted on October 7
28  and 25, 2012, leaving a balance of $8,743.70 as of the petition date.

(9th Cir. 1996). These five elements mirror those of common law fraud. *See*
*Field v Mans*, 516 U.S. 59, 69 (1995). In a nondischargeability action, the
creditor must prove these elements by a preponderance of the evidence. *See*
*Grogan v. Garner*, 498 U.S. 279, 286 (1991).

**Fraud and the Use of Credit Cards.** When the debt at issue arises from
the use of a credit card, the first, fourth, and fifth elements of the fraud claim
under § 523(a)(2)(A) are generally straightforward. For the reasons discussed
below, the court is persuaded that these elements of the Bank's claim have been
satisfied.

As to the first element, courts accept the premise that the debtor's use of a
credit card constitutes a representation to the creditor of the debtor's intent to
repay the debt. *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285
(9th Cir. 1996). For the fourth element, a creditor's reliance on the debtor's
representation need only be justifiable, not reasonable, to except a debt from
discharge under § 523(a)(2)(A) of the Bankruptcy Code. *See Field*, 516 U.S. at
74–75. In the credit card context, unless the debtor's credit card history is
marked by "red flags," the creditor can establish reliance on the debtor's promise
to pay the debt by simply showing that the debtor paid his or her credit card debts
in the past. *See In re Eashai*, 87 F.3d at 1091. As to the fifth element, the
finding of damages is supported by the fact that the debt was not repaid and is
subject to potential discharge in the bankruptcy proceeding.

In a credit card dischargeability case, the issues shift away from the actual
representation and focus more on the debtor's state of mind: nnowledge that the
representation was false and the intent to defraud. With respect to credit card
debt, the Ninth Circuit Bankruptcy Appellate Panel has noted,

> Where purchases are made through the use of a credit card with no
> intention at that time to repay the debt, that debt must be held to be
> nondischargeable pursuant to section 523(a)(2)(A). To hold otherwise
> would be to ignore the plain language of the statute and to reward
> dishonest debtors.

7

*Citibank S.D., N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988) (quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 753–54 (Bankr. N.D. Ind. 1986)) (internal quotation marks omitted), *abrogated on other grounds by Grogan*, 498 U.S. 279.

In *In re Dougherty*, the court adopted a nonexclusive list of twelve objective factors that "trial courts should consider" to determine the debtor's intent.[8]  *Id.*  However, "[t]hese factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent." *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1997); *see also Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 (9th Cir. 1999) ("*Dougherty* does not handcuff the trier of fact, who is in the best position to balance the objective evidence against the witness's testimony and credibility.  Totality of the circumstances means totality of the circumstances.").

Rather, "[s]o long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." *In re Hashemi*, 104 F.3d at 1125 (citing *Grogan*, 498 U.S. at 291).  Nevertheless, "the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt." *In re Anastas*, 94 F.3d at 1286.

---

[8]The twelve *Dougherty* factors are: (1) The length of time between the charges made and the filing of bankruptcy; (2) whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges are made; (6) whether the charges were above the credit limit of the account; (7) whether the debtor made multiple charges on the same day; (8) whether or not the debtor was employed; (9) the debtor's prospects for employment; (10) financial sophistication of the debtor;(11) whether there was a sudden change in the debtor's buying habits; and (12) whether the purchases were made for luxuries or necessities. *In re Dougherty*, 84 B.R. 657.

1    The Ninth Circuit has since adopted the *Dougherty* approach for
2    determining if the debtor used his or her credit card with a subjective intent to
3    deceive. "Since a debtor will rarely admit to his fraudulent intentions, the
4    creditor must rely on the twelve factors of *Dougherty* to establish the subjective
5    intent of the debtor through circumstantial evidence." *In re Eashai*, 87 F.3d at
6    1090.

7    The Ninth Circuit has described the *Dougherty* approach as a "totality of
8    the circumstances" principle and has stated, "Under this theory, a court may infer
9    the existence of the debtor's intent not to pay if the facts and circumstances of a
10   particular case present a picture of deceptive conduct by the debtor." *Id.* at 1087.
11   Applying the elements of actual fraud to the situation of a credit card debt, the
12   Ninth Circuit developed three essential inquiries: (1) did the card holder
13   fraudulently fail to disclose his intent not to repay the credit card debt; (2) did the
14   card issuer justifiably rely on a representation by the debtor; and (3) was the debt
15   sought to be discharged proximately caused by the first two elements. *In re*
16   *Anastas*, 94 F.3d at 1284 (citing *In re Eashai*, 87 F.3d at 1088).

17   In *In re Anastas*, the Ninth Circuit clarified that financial condition,
18   *standing alone*, is not a substitute for an actual finding that the debtor intended to
19   deceive the creditor when the charges were incurred. *Id.* at 1286. For this
20   reason, the court explained in *Anastas* that a trial court must not singularly focus
21   on the debtor's ability to repay the debts but on whether the debtor incurred the
22   debts with an intent not to repay. *Id.* at 1285. The *Anastas* court further clarified
23   that the "intent not to repay" inquiry must generally be applied to each individual
24   charge made to the credit card. *See id.* In that case, the court viewed each
25   individual credit transaction as the formation of an unilateral contract in which
26   the card holder promises to repay the debt plus accrued finance charges, and the
27   card issuer performs by reimbursing the merchant who accepted the credit card in
28   payment. *Id.*

9

In many credit card cases the inquiry is not whether the card holder lacked an intent to repay *all* of the charges made on the card because of a fraudulent financial scheme, but rather whether the card holder lacked an intent to repay when making certain *individual* charges because he planned to shortly discharge them in bankruptcy. This behavior is commonly referred to as "loading up."

*Id.* (emphasis in original).

**Recklessness and Fraudulent Intent**. In *Anastas*, the Ninth Circuit explained the § 523(a)(2)(A) requirements of bad faith and intent to defraud in cases where dischargeability of credit card debt is at issue. The court explained that, although these elements may not be implied in law, a court, under the totality of the circumstances, may infer or imply bad faith and intent to defraud where it is convinced by a preponderance of the evidence. *In re Anastas*, 94 F.3d at 1286 n.3. The court reiterated its prior holding, "that reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit." It phrased the inquiry as, "whether the debtor either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt." *Id.*

**Justifiable Reliance by the Creditor.** The Supreme Court has held that a creditor's reliance on a debtor's representation of intent to repay a debt must only be justifiable, rather than reasonable, to except the debt from discharge under § 523(a)(2)(A). *Field*, 516 U.S. at 74–75. The standard for "justifiable reliance" under § 523(a)(2)(A) is derived from the standard applied to the common law tort of fraud. *See id.* at 70. In *Field*, the Court looked to the Restatement (Second) of Torts to define that term. *Id.* Unlike an objective standard of reasonableness, "'[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" *Id.* at 71 (quoting Restatement (Second) of Torts § 545A, cmt. b (1976)). This court must therefore determine whether the Bank's reliance was justifiable based on an "'individual

10

standard of [the Bank's] own capacity and the knowledge which [it] has, or which may fairly be charged against [it] from the facts within [its] observations in the light of [its] individual case.'" *Id.* at 72 (quoting W. Prosser, Law of Torts § 108, at 717 (4th ed. 1971)).

"Justifiability is not without some limits, however." *Id.* at 71. "[A] person cannot rely upon a representation if 'he knows that it is false or its falsity is obvious to him.'" *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1458 (9th Cir. 1992) (quoting Restatement (Second) of Torts § 541). Rather, a person is "'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 541, cmt. a). "'In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.'" *In re Eashai*, 87 F.3d at 1090–91 (quoting *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir. BAP 1995)).

Typically, in a credit card case under § 523(a)(2)(A), "the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." *In re Anastas*, 94 F.3d at 1286 (citing *In re Eashai*, 87 F.3d at 1091). But "[i]f the creditor had warning that the debtor's account was *in danger of default*, the creditor will not be able to establish justifiable reliance." *In re Eashai*, 87 F.3d at 1091 (emphasis added).

Here, the Credit Cards were used for a substantial number of transactions within the last month before the bankruptcy was filed. As a matter of contract law, the Debtors were obligated to repay that debt and the use of those Credit Cards carried with it an implied promise that the Debtors would do so. The Bank

11

1    relied upon that promise when it (1) allowed the Debtors to continue using their

2    Credit Cards; and (2) paid the vendors for the purchases made with the Cards.

3    The Bank's reliance was justified because the Debtors had not missed a payment

4    to the Bank prior to October 2012, and there were no apparent "red flags" to

5    suggest that the Debtors might not fulfill their financial obligation to the Bank.

6    Unless the debt is determined to be nondischargeable, the Bank will be damaged

7    by use of the Credit Cards because the debt will be uncollectible once the

8    Debtors receive their discharge.

9          **Dischargeability of the Debt for Luxury Goods and Services.**  For

10    some consumer debts, the nondischargabililty question is settled by a statutory,

11    but rebuttable, presumption. "[C]onsumer debts owed to a single creditor and

12    aggregating more than $600 for luxury goods or services incurred by an

13    individual debtor on or within 90 days before [the commencement of the

14    bankruptcy] are presumed to be nondischargeable." § 523(a)(2)(C)(i)(I).  It is not

15    that charges for luxury goods are different, but that the purchase of luxury goods

16    within a short time of filing bankruptcy places the burden on the debtor to show

17    that the purchases were not made in contemplation of bankruptcy.  As the court,

18    in the unpublished case, *In re Youssef*, 2007 WL 2363286, *4 (Bankr.D.Kan.,

19    August 14, 2007) explained,

20          This provision was enacted in 1984 "to deter debtors from purchasing
          exemptable items with credit in contemplation of bankruptcy." A creditor
21          bears the burden of showing, by a preponderance of the evidence, that the
          nondischargeability presumption applies to its claim. The debtor may then
22          rebut the presumption. The debtor's burden is determined in light of the
          purpose of the presumption. "Congress' motive for adding § 523(a)(2)(C)
23          to the Bankruptcy Code in 1984 was to rectify a perceived practice by
          debtors of 'loading up,' or going on credit buying sprees in contemplation
24          of bankruptcy." The section "presumes that the debtor purchased the items
          without intending to pay for them." To rebut the presumption of
25          fraudulent intent, the debtor therefore must directly attack the presumed
          fact and raise substantial doubt in the mind of the trier of fact as to the
26          existence of the presumed intent. The presumption can therefore be
          rebutted by evidence that the "portion of such claim was not incurred in
27          contemplation of his discharge in bankruptcy."

28

                                        12

*In re Youssef*, 2007 WL 2363286, *4 (Bankr.D.Kan., August 14, 2007) Footnotes and citations omitted.

The presumption of nondischargeability "can be overcome by evidence that the debtor experienced a sudden change in circumstances or that the debtor did not contemplate filing a bankruptcy petition until after the transaction took place." *Id.*, citing 4 Collier on Bankruptcy ¶ 523.08[5].

Here, all of the 69 disputed charges were made during the month in which the bankruptcy case was filed and the evidence (information in the billing statement) suggests that many of the items purchased were "luxury goods." The Debtors did not appear to testify at the trial and thus the presumption of nondischargeability for the luxury goods has not been rebutted.

Although the Bankruptcy Code does not define the term "luxury goods," we do know that "it does not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." § 523(a)(2)(C)(ii)(II). Therefore, the court must look to the circumstances surrounding the purchases to determine whether they are considered "luxury" purchases for the purposes of the code section.

In *In re Davis*, 56 B.R. 120, 122 (Bankr.D.Mont.,1985), the court concluded that the purchase of a 1984 van for $9,206, after the trade-in of the debtors' older automobile, was not a purchase of a "luxury good." Although the purchase was a substantial expense, the court noted that Montana law contains an exemption for a motor vehicle, thus expressing a public policy that an automobile is "essential for family needs." The court also cited the fact that the debtors had chosen to purchase a used vehicle, exercising "some decree of fiscal responsibility," and indicating it was not purchased with the intent to discharge the debt in bankruptcy. *Id.*

In this case, there is no direct evidence regarding the nature of the purchases and so the court must infer from the circumstances, including the nature of the stores, the amount of the purchases, and the frequency of use of the

13

Credit Cards, whether any or all of the charges in question are subject to the "luxury goods" presumption.  During the month of October the following purchases were made at stores which do not appear to sell groceries or other goods or services that would reasonably be necessary for the support or maintenance of the Debtors or their dependants:

John's Credit Card:

| | |
|---|---|
| Cannon USA Direct, Electronics | $943.77 |
| Overstock.com | 1,748.83 |
| The Home Depot | 2,489.03 |

**Total: $5,181.63**

Brenda's Credit Card:

| | |
|---|---|
| Michaels (Artist Supply and Craft Store) | 39.37 |
| Michaels | 32.11 |
| Michaels | 12.84 |
| Michaels | 9.64 |
| Experian Credit | 19.95 |
| Michaels | 25.12 |
| Michaels | 20.78 |
| Michaels | 49.95 |
| Party City | 10.05 |
| Party City | 43.88 |
| TJH Bakersfield, Restaurant | 80.41 |
| Michaels | 56.98 |
| Baskin Robbins | 9.64 |
| Michaels | 7.92 |
| Michaels | 23.04 |
| Peoplesmart.com | 23.45 |
| THJ Bakersfield Restaurant | 22.59 |
| Macy's (Coach Handbags $398) | 35.40 |
| Macy's (women's clothing) | 126.23 |
| Macy's (women's shoes) | 426.86 |
| Best Buy Electronics | 220.81 |
| Macy's (Jewelry) | 149.06 |
| Best Buy Electronics | 699.84 |
| | 49.34 |
| | 859.68 |

**Total: $3,054.94**

**Total for both Credit Cards:**                    **$8,236.57**

The monthly billing statement that includes the Disputed Charges shows pre-petition new charges of 9,574.10.  Of this amount, $8,236.57 is presumptively

14

nondischargeable as having been incurred for the purchase of luxury goods or services incurred within 90 days of filing of the petition.[9]  However, even if the presumption did not apply to these charges, they still would be excepted from the discharge under § 523(a)(2)(A) for the reasons set forth below with regard to the balance of the debt.

**Dischargeability of the Debt for Purchases not Subject to the Presumption.**  Based on the totality of the circumstances, and the Debtors' decision to not appear and offer a defense of this adversary proceeding, the court is persuaded that the remainder of the balance due on the Account is also excepted from the discharge.  The mere fact that charges were made after the Debtors consulted with their bankruptcy attorney and shortly before filing their petition, is not, by itself, dispositive.  It is significant, however, when considered in conjunction with all of the other circumstances, including the drastic increase in frequency and amount of Credit Card usage.  The court has no choice but to find that the disputed charges were made without any intent to repay the debt.

**Use of the Credit Cards by Third Parties.**  In a joint declaration submitted to the court on August 14, 2013 (the "Declaration"), the Debtors state that they did not personally use the Credit Cards for all of the charges at issue here.  Indeed, the Debtors state that "some friends suggested that we continue to make purchases on credit," after learning that the Debtors were preparing to file bankruptcy, and that "we understand, and learned later that some of them made charges to our account."  The Debtors did not plead this fact as an affirmative defense so the issue is not even properly before the court.  However, the court will address the issue in an effort to fully consider the Debtors' views on this matter.

---

[9]Because the court finds the entire balance is nondischargeable, there is no need to adjust this amount for returned items and account payments.

1       The Debtors did not appear at trial or offer any explanation as to who, if

2  not themselves, did use the Credit Cards, and under what circumstances.[10] They

3  did not contact the Bank to report the Credit Cards lost or stolen. They do not

4  attempt to identify which of the 69 charges were made by others and they do not

5  explain how the "friends" happened to have access to both of their Credit Cards

6  for the entire month at issue. In their discovery responses the Debtors take full

7  responsibility for the disputed charges.[11] Even assuming, without finding, that

8  the Debtors did not personally present their Credit Cards to the merchants for

9  some or all of the disputed transactions, the Debtors have essentially admitted

10  that the Credit Cards were used by somebody for the fraudulent purpose of (1)

11  running up the bill, and (2) discharging the debt in this bankruptcy. The issue

12  then would be whether this fraud can be imputed to the Debtors.

13       Although cases dealing with situations such as the Debtors allege are rare,

14  the court did find a decision from the Central District of California which

15  affirmed the bankruptcy court's determination that cash advances made by a third

16  party should be excepted from that debtor's discharge. In the case, *In re Wood*,

17  213 B.R. 866 (C.D.Cal.,1997) the debtor allowed her sister to use her credit card

18

19

20  [10]When a party to litigation fails to call an available witness whose testimony could be expected to favor him, the court can draw a "missing witness" inference that

21  the witness would have exposed facts unfavorable to the party. *Bohm v. The Horsley Company (In re Groggel)*, 333 B.R. 261, 303-04 (Bankr. W.D. Pa. 2005), citing *United States v. Busic*, 587 F.2d 577, 586 (3rd Cir. 1978) (other citations omitted). "The

22  missing witness inference is inapplicable unless the information possessed by the absent witness is both material, that is relevant to the case, and non-cumulative." *Id.* at 304.

23  When it is shown that a witness was not called for reasons that are reasonable and proper, no unfavorable inference is permitted. *Id.* at 304, citing 29 Am.Jur.2d, *Evidence*

24  § 247 (other citation omitted). Similarly, the missing witness inference is not permitted if a party has good reason to believe the opponent has failed to meet its burden of proof,

25  *Id.* at 304, citing *Int'l Union, UAW v. N.L.R.B.*, 459 F.2d 1329, 1338 (D.C. Cir. 1972) (other citation omitted).

26

27  [11]The court notes that the Card Member Agreement that applies to the Account provides as follows: "You promise to pay all charges, including: charges that other people make if you let them use your Account, and charges that Additional

28  Cardmembers make or permit others to make." Pl's. Ex. 3 at 3.

to take $6,830 in cash advances for use in the sister's business. Although the debtor stipulated that she had no intention or ability to pay back the cash advances herself, counting instead on her sister to repay the debt, she knew she was legally liable as the contracting signatory. The court phrased the issue under § 523(a)(2)(A) as, whether the charges were nondischargeable "because the debtor was reckless in representing" that she would repay the debt.

The debtor's defenses were two-fold, first, that the debtor was not reckless even though she had no ability or intent to repay, because she expected her sister to pay. Second, the debtor argued that she did not receive "'. . . money, property, services, or an extension, renewal, or refinancing of credit . . . obtained by . . . a false representation . . .'" as required by § 523(a)(2)(A), since it was not the debtor, but the debtor's sister, who received the benefit.

The court was not persuaded by either of the debtor's arguments. It reiterated the "recklessness" standard of *In re Anastas*, 94 F.3d, 1286, and said the financial circumstances of her sister provided no basis on which the debtor could reasonably believe her sister would be able to repay the debt.

The court held that the debtor's second argument, that she received no benefit from the use of the card, was in error as a matter of law. The sister was essentially acting as the debtor's agent in taking the cash advances. "Contractually speaking, Debtor took the cash advances and then lent or made a gift of the funds to the Debtor's Sister." *Id.*, 870. Thus, the court explained, "Debtor is squarely within the express language of § 523(a)(2) . . . Debtor '. . . received money, property, services, or an extension, renewal, or refinancing of credit . . . obtained by false representation . . .'" Even, added the court, if the debtor's sister was viewed as being the one who made the transactions, "then Debtor made a gift to her sister . . . because Debtor, not her Sister, was the party who was contractually obligated to repay the amounts taken." The court noted that the ability to make a gift is a benefit for the purposes of § 523(a)(2). *Id.*

17

In the case at hand, the Debtors acknowledge that they are contractually liable for the debt to the Bank, and that the Credit Cards were used for an express improper purpose, to defraud the Bank. They have not shown that the Cards were stolen or used without their knowledge and consent. This use of the Credit Cards continued for the entire time between the Debtors' first consultation with counsel and the filing of their petition. They made no effort to stop the improper use of their Cards or to notify the Bank. The court is therefore persuaded that the Credit Cards were used with the Debtors' knowledge and consent. The "family and friends" who used the Cards acted as the Debtors' agents and the Debtors received a benefit from those transactions. The fraudulent use of the Credit Cards must therefore be imputed to the Debtors and the dischargeability analysis would be unchanged.

**CONCLUSION.**

Based on the foregoing, the court finds and concludes that the Credit Cards were used either by, or with the knowledge and consent of, the Debtors at a time when the Debtors were preparing to file a bankruptcy petition and seek a discharge of the resulting debt. A majority of the items purchased with the Credit Cards were luxury goods within the meaning of § 523(a)(2)(C) and the debt for those items is presumptively nondischargeable. As for the remainder of the purchases, the Credit Cards were used with an actual intent that the debt would not be repaid. Accordingly, judgement will be entered in favor of the Bank in the amount of $8,785.19. The judgment will be nondischargeable pursuant to § 523(a)(2)(A) and (C). The Bank will be awarded its reasonable costs of litigation and such attorney's fees as provided in the contract documents. Counsel for the Bank shall submit a proposed judgment.

Dated: December ___4___, 2013

W. Richard Lee
United States Bankruptcy Judge

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

     The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the BNC or, if checked ____, via the U.S. mail.

     Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and __X__ Other Persons Specified Below:

John M. O'Donnell, Esq.
Attorney at Law
915 University Ave.
Sacramento, CA 95825

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare Street, Suite 1401
Fresno, CA 93721